UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CASSANDRA GESKE, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN WAGERING, INC., d/b/a William Hill and Caesars Sportsbook, <br><br> Defendant. | No. 23 C 1665 <br><br> Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

Cassandra Geske brings fraud and misrepresentation claims regarding Defendant's online sports gambling service. Defendant has moved to compel arbitration. R. 21. That motion is denied.

When a person signs a paper contract, the staple plays a far greater role than is generally acknowledged. The signatories are held to have read and agreed to the terms expressed on the pages stapled to the signature page. *See Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016) ("Generally, a party who signs a written contract is presumed to have notice of *all* of the contract's terms.") (emphasis added).

This motion is about the virtual equivalent of a staple. Geske does not dispute that she intended to create an account with Defendant. And she does not dispute that she reached an agreement with Defendant to create that account by clicking "submit"

on the screen of Defendant's smart phone application (Defendant's "app"). Here is the relevant screen from the app:



R. 22 at 4.

The parties dispute, however, whether Defendant's "Terms of Service" are part of that agreement. Defendant argues Geske agreed to the "Terms of Service"

2

referenced in the screen above, because she clicked the "submit" button under the statement that "By submitting, I confirm that . . . I agree to the Terms of Service." *Id.* According to Defendant, this assent, and the fact that the Terms of Service were available on a different screen on the app, constitute circumstances showing that Geske received, "reasonable notice" of the terms of the agreement. *See Sgouros*, 817 F.3d at 1034-35 (explaining that court should "ask whether the web pages presented to the consumer adequately communicate all the terms and conditions of the agreement, and whether the circumstances support the assumption that the purchaser receives reasonable notice of those terms"). Geske concedes that the Terms of Service contain an arbitration clause that would require arbitration of her claims in this case.

Geske argues, however, that because the agreement screen did not include a hyperlink to the Terms of Service, they cannot have been part of the agreement. The parties both cite Illinois law on this issue. With respect to "online contracts," the Illinois Appellate Court has held that contract terms hyperlinked to "Web pages the plaintiffs completed in the ordering process . . . . should be treated the same as a multipage written paper contract. The [hyperlink] simply takes a person to another page of the contract, similar to turning the page of a written paper contract." *Hubbert v. Dell Corp.*, 835 N.E.2d 113, 121 (Ill. App. Ct. 5th Dist. 2005). In other words, the hyperlink performs the same function as a staple, which is to provide "reasonable notice" to the signatories of the terms included in their agreement.

3

A hyperlink, or a scroll box containing the agreement, placed "next to an 'I Accept' button that unambiguously pertains to that agreement," are the most common ways of providing reasonable notice in an online contract. See *Sgouros*, 817 F.3d at 1036. But there "are undoubtedly other ways as well to accomplish the goal." *Id.* At a minimum, however, the locus of the act of agreement—i.e., the signature block for a paper contract, or the check box or the button the signatory uses to indicate agreement for an online contract—must be directly connected to the terms of the agreement so as to prevent any ambiguity. Like a staple, a hyperlink or a scroll box both provide this direct connection.

Here, however, there was nothing on the agreement page where Geske clicked "Submit" defining the phrase "Terms of Service." Defendant argues that a reasonable person would understand that this phrase refers to the "Terms of Service" available elsewhere on the app. *See* R. 37 at 4 ("A reasonable user would recognize that the phrase 'Terms of Service' on the account registration screen directs them to the Home screen button labeled with the same capitalized phrase."). But this is an inferential leap courts have rejected.

Courts generally categorize online contracts as "browsewrap," "clickwrap," or some hybrid of the two. *See Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 790 (N.D. Ill. 2011); *Gamboa v. Proctor & Gamble Co.*, 2022 WL 1639559, at *2 (N.D. Ill. May 24, 2022). The "wrap" portion of these terms alludes to agreements consumer products manufacturers intend to impose on consumers when they open the "shrinkwrap" of a product. *See ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1449 (7th

Cir. 1996) ("The 'shrinkwrap license' gets its name from the fact that retail software packages are covered in plastic or cellophane 'shrinkwrap,' and some vendors . . . have written licenses that become effective as soon as the customer tears the wrapping from the package."); *see also Savetsky v. Pre-Paid Legal Servs., Inc.*, 2015 WL 604767, at *3 (N.D. Cal. Feb. 12, 2015) (discussing the relationship among the three).

Similarly, manufacturers or service providers seek to impose terms of service on consumers for merely "browsing" a website or app. Courts have found that determining whether a "browsewrap" agreement is enforceable depends on whether the location of the terms of service on the website or app was such that the user was on "inquiry notice" or "constructive notice" of the terms. *See Anand v. Heath*, 2019 WL 2716213, at *3 (N.D. Ill. June 28, 2019). Courts have frequently held that if the website or app is designed such that the user is required to "scroll down" to find the terms of service, or the terms of service are otherwise "hidden" among other information on the website or app, then the user will not be charged with the "inquiry notice" or constructive notice" necessary to establish agreement to the terms of service. *See, e.g.*, *Van Tassell*, 795 F. Supp. 2d at 792. As discussed, the most common and legally viable solution to the "browsewrap" dilemma are "clickwrap" agreements, where the user is required to click a box or button stating that they agree to the terms placed immediately next to the button in a scroll box contained the terms of service, or a link to the terms of service.

In other words, most courts have found that the mere statement that the user agrees to the terms of service is insufficient to establish agreement to those terms.

5

The website or app must be designed such that it is readily apparent *what* terms the statement of agreement is referring to. Without this direct connection, the phrase "Terms of Service" retains an unacceptable level of ambiguity.

Defendant would argue that there is no ambiguity here because there is only one "Terms of Service" available on its app. There is some merit to this argument. But as discussed, the majority of courts have rejected it. This is because there is nothing in the user's assent to the statement that they agree to the terms of service that establishes that the user had ever been shown, let alone read, the terms of service. When the terms are included in a scroll box or hyperlinked, and the user clicks a box or button demonstrating assent to a statement of agreement to those terms, it is reasonable to find that the user read and understood the terms because they are immediately present or directly linked on the equivalent of another page. But when the terms are not present or directly linked to the statement of agreement, the user is forced to *go find* the terms. In such circumstances, there is insufficient evidence that the user was actually aware of the terms. Without this awareness created by directly presenting or linking to the terms, there is insufficient evidence of "reasonable notice" necessary to establish a legally binding agreement.

## Conclusion

For these reasons, Defendant's motion to compel arbitration [21] is denied.

Defendant also filed a motion to dismiss, *see* R. 21, to which Geske did not respond, in part due to ambiguity in a Court order. And Geske filed a motion to amend her complaint, *see* R. 25, which Defendant opposes. Even if the Court were to grant

Defendant's motion to dismiss without the benefit of a response from Geske, the Court would generally as a matter of course permit Geske to replead. *See Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1024 (7th Cir. 2013) ("Under Rule 15(a), fee-paying plaintiffs enjoy leave to amend whenever 'justice so requires' and, as a matter of course, almost always get an opportunity to amend their complaints at least once. . . . even after a court grants a motion to dismiss."). Therefore, Defendant's motion to dismiss [21] is denied without prejudice, and Geske's motion to amend [25] is granted. The Court's denial of Defendant's motion to compel arbitration has changed the landscape of the case, so Geske should file a new amended complaint by 2/20/2024. Defendant should answer or file a motion to dismiss by 3/12/2024, with Geske's response due 4/2/2024, and Defendant's reply due 4/16/2024.

Lastly, over the past year, the parties filed several letters on the docket. The parties are ordered to stop filing letters concerning contested issues. Any request for Court action regarding the substance of the case must be made by motion. Scheduling and other logistical issues can be addressed in a joint status report when appropriate or by email to the Court's Deputy.

ENTERED:

_Thomas M Durkin_
Honorable Thomas M. Durkin
United States District Judge

Dated: February 5, 2024